Filed 2/26/21  P. v. Shrofe CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076844 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. Nos. SCD275604-04, SCD278606-02) |
| BRYAN WAYNE SHROFE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Affirmed.

Alex N. Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Alan L. Amann and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendant Bryan Wayne Shrofe appeals from a judgment entered in Superior Court case Nos. SCD275604-04 and SCD278606-02. In case No. SCD275604-04, a jury convicted Shrofe of one count of burglary. In case No. SCD278606-02, Shrofe pled guilty to one count of unlawful possession of firearms ammunition and one count of unlawful possession of a firearm by a felon.

With respect to his conviction for burglary, Shrofe contends that the prosecutor committed misconduct during closing arguments by (1) improperly shifting the burden of proof to Shrofe, and (2) mentioning a specific item of evidence only in rebuttal, thereby "sandbagging" the defense and also improperly commenting on Shrofe's failure to testify by suggesting that he failed to explain the existence of that evidence. We conclude that no prosecutorial misconduct occurred.

Shrofe also requests that this court review the transcript of an in camera hearing held in response to Shrofe's motion to unseal, quash, and traverse a search warrant that was executed in connection with the case in which Shrofe pled guilty to unlawful possession of firearms ammunition and unlawful possession of a firearm. Shrofe asks this court to review the in camera hearing transcript and any documents presented to the court during that hearing to determine whether the search warrant was properly sealed. As we explain further in the discussion section of this opinion, we have conducted the requested review and conclude that the trial court did not err in denying Shrofe's motion.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

Late in the morning on February 1, 2018, a truck with out-of-state license plates and a trailer attached to it parked in front of H.V.'s home on Westwood Street in San Diego. Both H.V. and another neighbor, E.C., who lived around the corner from H.V. on Ablemarle Street, saw five people emerge from the truck, including Shrofe, who had been driving. H.V. and E.C. each watched Shrofe and the group as they walked from the truck toward a home on Ablemarle Street that was almost directly across from where E.C. lived. The house that the group was approaching was unoccupied. The home had previously been owned by Robert and Janet Graf. The Grafs had both passed away, and none of the people who had come to lawfully own and possess the house—Martha Jimenez and her children, Fredy Barrios and Lucelle Guerra—had moved into the house at the time of this incident.[1]

Although no one was living in the house on February 1, 2018, Barrios had performed property maintenance on the home. According to Barrios, he was the only person who had been in the house since Janet Graf's death; Barrios testified, "There was no entrance of the house. Nobody went in there whatsoever." At that point in time, the Grafs' possessions, including Janet Graf's collection of owl themed "jewelry, watches, statues, [and] ceramics" remained in the house.

---

[1]     Janet Graf, who had survived Robert Graf, passed away in December 2017. Janet bequeathed the house to Jimenez, who gave it to Barrios and Guerra. Barrios eventually moved into the house sometime after February 1, 2018. Given this sequence of events, for clarity, we will refer to the residence as "the Graf residence."

H.V. and E.C. each watched as Shrofe and the group walked along Ablemarle Street before turning into the driveway of the Graf residence. The group approached the house and entered it through a door that was locked with two deadbolts and required a key for entry. E.C. was aware that no one other than Jimenez and her family had keys to the home, so she called Barrios. Barrios told E.C. that he was not at the house and that no one was supposed to be there; E.C. then called 911. E.C. watched the home as she waited for police to respond. E.C. did not observe anyone exit the house from the front of the residence before police arrived.

Police officers arrived within a few minutes and secured the perimeter of the Graf residence. A few minutes later, Shrofe, Samantha Clark, Sergio Ortega, Lance Richardson, and Anna Vargas emerged from the home. One of the police officers testified that the defendants all appeared "shocked and surprised" to see him outside the residence. He observed Vargas immediately go to the side of the house, where she appeared to put something down on the ground next to the garage before returning to the front of the house. The officer also observed Richardson walk to a nearby retaining wall that was next to the garage, where he appeared to squat or bend down, and then return to the group. At that point, the officers detained the group at gunpoint and handcuffed them.

Shrofe and the other members of the group claimed that they were " 'movers.' " However, they had no moving truck or moving supplies, were not wearing uniforms, and otherwise did not appear to the police to be movers.

When police searched the area on the side of the house where they had seen Vargas place something, they found Janet Graf's purse. The purse contained Janet Graf's silver revolver, firearms ammunition (both live and spent), bottles of prescription medication with Janet's name on it, Janet's

4

wedding ring, an owl pin and necklace, various military pins, Robert Graf's engraved lighter, as well as a credit card, a debit card, and a medical identification card, all with Robert's name on them. In bushes near the retaining wall, police found a chrome revolver that had its serial number removed.

The police searched Shrofe and the other members of his group. In Shrofe's pants pockets, police found a set of keys, a wallet, some change, another lighter that had belonged to Robert Graf, and assorted earrings, rings, and necklaces, most of which had belonged to Janet Graf. Vargas was in possession of a pair of blue latex gloves and an iPhone. Richardson was in possession of several pocket watches, a "chain that looked like an owl," a coin box, a liberty coin, a flashlight, some keys, and Janet Graf's Costco card. Clark was found to be wearing a wig and construction work-type gloves; in her pocket she had six cards, one of which was an identification card that had belonged to Robert Graf.[2] Ortega was found with a set of keys in his pocket that had belonged to Janet Graf and had been left inside the house after Janet's death. The set included keys to multiple exterior doors of the residence.

Police obtained Shrofe's consent to search the truck in which the group had arrived. In the truck, police found a box of blue latex gloves on top of the dashboard, identical to the ones that Vargas had in her possession. On a seat in the rear of the truck's cab, police found a purse containing a military identification card and two credit cards, all in Clark's name. In the bed of the truck, police found an owl earring that was partially covered by a duffel bag.

---

[2]    A detective testified that stolen identification cards are commonly used to conceal one's identity or for purposes of committing identity theft.

Police inspected the exterior of the Graf residence and noticed a kitchen window that appeared to have been forced in. The screen had been removed from the window, and there was a wire cage placed underneath the window that had apparently been used to assist in gaining entry through the window. Inside, police found the house in a state of "disarray." An officer testified that the house was "messy" and "looked like it had been ravaged through." Another officer testified that the home "appeared to [have] be[en] ransacked." There were "piles of clothes and jewelry and other property" that appeared to have been "taken out and . . . thrown on the floor."

When Jimenez and Barrios later went inside the house, they observed a marked change in the state of the residence from the last time each of them had been there. The home had previously been "intact," with "stuff . . . properly put away where it needed to be." After February 1, 2018, the home was "trashed," "every room had been ransacked," and there were "items in piles throughout the house and in rooms." Barrios testified that he noticed that exterior doors had been "pried open," and that an air conditioning unit that had previously been fitted into a window had been kicked in.

Police conducted DNA testing on the two handguns that were found outside the Graf residence. The results of this testing with respect to one of the guns was inconclusive as to Richardson, Clark, and Vargas, and excluded Shrofe and Ortega. The results for the other gun were inconclusive as to Ortega and Richardson, and excluded Shrofe, Clark, and Vargas.

At trial, Barrios testified that he did not know any of the individuals who were part of the group that entered the Graf residence on February 1, 2018. He further testified that "[t]here was nobody that was supposed to be there [in the house]," and that, apart from him and his mother, no one had

6

been given a set of keys to the house and no one had permission to have a set of keys to the house.

All five defendants were tried together. Clark was the only defendant who testified at trial. She testified that she and Shrofe, who was her boyfriend at the time, worked together in a business called "BNS Transport," and that they transported components of trucks and vehicles that had been damaged, to auction yards. According to Clark, on the morning of February 1, 2018, she, Shrofe, and Richardson—whom Clark had met for the first time that morning—were en route to a job in Shrofe's truck when Shrofe stopped by Ortega's house. There, they picked up Vargas and Ortega. Shrofe told Clark that he, Clark and Richardson were "going to go help [Ortega and Vargas] with something that [Ortega] was hired for," and that "a family member had asked or hired them to come down and pack up the home." Clark testified that pursuant to that arrangement, "We were not to remove anything out of the home." Shrofe parked his truck, and the five of them walked to the Graf residence, where, she said, Ortega opened the door with a key. Clark testified that once she was inside the house, she started packing. She denied having seen anyone in the group take anything. While inside, she heard a commotion outside, and when she went outside, she and the others were detained by the police.

B. *Procedural background*

Shrofe and his four codefendants were charged with burglary (§ 459) and grand theft of a firearm (§ 487, subd. (d)(2)) in case No. SCD275604-04.[3]

---

[3]    Richardson, Ortega and Shrofe were also originally charged with illegal possession of a firearm by a felon. (§ 29800, subd. (a)(1).) However, that charge was dismissed as to Ortega and Shrofe prior to trial.

Shrofe and codefendant Ortega were convicted of burglary. The jury deadlocked as to the remaining count with respect to Shrofe and Ortega, and as to both counts with respect to the remaining codefendants. The trial court declared a mistrial as to the charges on which the jury deadlocked.

In a separate case, case No. SCD278606-02, Shrofe subsequently pled guilty to possession of firearms ammunition (§ 30305, subd. (a)(1); count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). He also admitted the truth of an allegation that he was on bail at the time he committed these offenses (§ 12022.1, subd. (b).)

The trial court sentenced Shrofe to a term of two years in prison on each case, to be served concurrently. Shrofe filed a timely notice of appeal.

## III.

## DISCUSSION

A. *The challenged comments by the prosecutor during closing arguments did not amount to misconduct*

Shrofe raises two arguments for reversal based on statements made by the prosecutor during closing arguments. First, Shrofe contends that during the prosecutor's closing argument, the prosecutor made two statements that improperly shifted the burden of proof to Shrofe by commenting on the defense's failure to call certain witnesses. Second, Shrofe argues that by waiting until rebuttal to suggest that Shrofe had failed to explain the existence of the owl earring in the bed of his truck, the prosecutor "sandbagged" the defense and engaged in error under *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*) because the prosecutor's statements amounted to a comment on Shrofe's failure to testify.

We conclude that the prosecutor's comments did not amount to misconduct.

8

1. *Additional relevant background*

Shrofe's defense was that he had not entered the Graf residence with the intent to commit theft, as would be required for a burglary conviction, because he believed that he and the group had been hired, indirectly, by someone, through Ortega, to pack the belongings in the Graf residence and that he therefore believed that he had permission to enter the house.[4] Shrofe's counsel commented in closing that the question of "whoever hired these people to go there, how did they get there" was the "million-dollar question we have in this case." Shrofe's attorney then made a reference to Clark's testimony, and asked the jury to "look at the facts, at the circumstantial evidence and see if it actually fits and it's reasonable."

In addition to arguing that the defendants believed that they had been hired to pack up the items in the Graf residence, counsel for Shrofe and his codefendants also suggested that someone else had broken into the house at an earlier point in time. The defense intimated that a person identified as "Louie," who was a neighbor of the Grafs and purportedly of disrepute, had planned to break into the Graf residence. This line of argument also suggested that Louie may have "hired" Ortega, Shrofe, and the rest of the group to pack the Grafs' belongings, possibly in an attempt to "dupe[ ]" them into taking the fall for a break-in that Louie had committed.

In rebuttal, the prosecutor noted that Clark, the only defendant who testified at trial, was not credible, and that her testimony was designed to give herself "plausible deniability," because her story permitted her to claim

---

4    Shrofe's codefendants asserted the same defense.

9

complete ignorance of the details of the purported hiring arrangement.[5] Moreover, Clark's contention that the defendants had simply been hired to pack up the Grafs' belongings was contradicted by the fact that all five defendants were found with various items that had belonged to the Grafs on their persons, including identification cards, jewelry, keys, and even a firearm. The prosecutor also pointed out that Clark's testimony was not credible because the group had brought no boxes or other packing materials to the home, and they had not parked the truck in front of the home, as would have been expected of individuals who had been hired to do a job at the home.

The prosecutor argued that there was no evidence that would corroborate or otherwise substantiate Clark's claim that someone had hired Ortega, and by extension, the others in the group, to pack up the Grafs' belongings. On this point, the prosecutor argued:

> "Another detail from this story, this family member, this mystery person who supposedly hired them and essentially hired Sergio Ortega, who then hired everyone else. Well, the only people that matter in this case in that regard are Martha [Jimenez] and Fredy [Barrios], who have no idea who any of these people are. Janet and Robert who are deceased. And [E.C.] who has no legal ownership of the house still said, I have no idea who these people are.

> "So who is this person? This is their alibi witness. This person that hired Sergio Ortega and all of these defendants indirectly, this is their alibi witness. And these defense attorneys have absolutely no burden, no burden to produce evidence, no burden to call witnesses. But they can't then

---

[5]     Clark testified that she was not privy to any discussion relating to the claimed hiring arrangement, either because she was not with Shrofe and Ortega during their discussions or because she had fallen asleep in the back of the truck. Because of this, she claimed, all she knew was what Shrofe had told her—i.e., that "we were just going to go and pack up a house."

ask you to believe something without supporting it with evidence.

"They can't ask you to speculate what would this mystery person who doesn't exist have testified to? You don't think that in 18 months, this alibi witness would have been made known by one of the defense attorneys? They have resources. They are able to conduct their own investigations."

At this point, the trial court overruled a defense objection, but also admonished the jury by stating, "The defense attorneys have absolutely no obligation to produce any evidence for you whatsoever." The prosecutor continued:

"And so, they are asking you to believe an alibi witness that you never heard from and you never heard about. Because this person doesn't exist. This person is a phantom. The one person that can exonerate all of them and you have no idea who that person is."

Finally, the prosecutor argued that the defendants' claim that someone had hired them to pack up the belongings in the house did not make sense given another item of evidence that had been presented at trial—the owl earring that was found in the back of Shrofe's truck. Addressing this piece of evidence, the prosecutor stated:

"[The defense claim of a hiring arrangement] is the story. That is the lie they are trying to sell you. And the one thing that none of them, none of the defendants can explain to you is that [Shrofe] has never been to that house. And no one exited that house between the time that they entered and the time they were contacted by police. And there is an owl earring in the trunk [*sic*] of that bed it doesn't add up, ladies and gentlemen. The lie doesn't add up."

11

The prosecutor argued that this aspect of the story did not make sense, and when considered with the fact that the defendants did not have any moving materials, had parked the truck around the corner, and "accidentally put these things in their purse[s]," it demonstrated that Shrofe and his codefendants "didn't go in [the Graf residence] with the intent to pack up a house. They didn't go in there with the intent to move. They went there with the intent to steal from that house."

The prosecutor also addressed the defense's suggestion that it was possible that "Louie" had hired the group in order to frame them for his own burglarizing of the residence. The prosecutor argued that no evidence had been presented that implicated Louie in the group's burglary of the Graf residence:

> "And now, throughout the course of this trial you heard about Louie. Louie this, Louie that. Louie is a neighbor. Louie is a bad guy. Louie stole a truck. Louie, Louie. You don't know anything about Louie. You know he is the back neighbor. But ask yourselves, what evidence is there of Louie? Again, had the opportunity to interview Louie—"

At that point, there was a defense objection on the ground that the prosecutor was improperly burden shifting, which the trial court sustained. The prosecutor continued:

> "You don't know anything about Louie. And you're never going to hear anything about Louie. Because Louie is the person who they are trying to put on trial. Louie is the person who is not here with an attorney, who doesn't have a voice in this courtroom. And they are hoping that you can speculate as to what Louie did in this case.
>
> "You have no idea. All you know is that two people may or may not have tried to cut through the fence on the back side of where Louie lives, had a pair of bolt cutters. And this was all a week later. What does any of that have to do

12

with February 1st, 2018? Louie wasn't contacted coming out of that house. Louie didn't have Janet and Robert Graf's property in his pockets. And they're trying to claim that Louie set them up.

"What evidence do you have of that? You have no evidence. And take this to the logical conclusion. Let's say that Louie hired them to pack up this house. How does Louie benefit from that? What was Louie going to do? Louie is the back neighbor. If he is smart enough to cut through a fence, don't you think that he would have been able to go in the house and steal on his own?

"Why would he need to implicate other people to do his dirty work for him? Ladies and gentlemen, it does not make sense. The other alternative is that Louie is the mastermind behind this and they all had the intent to commit theft. And Louie also had the intent to commit theft. So Louie is also guilty of a crime. But Louie again is not on trial.

"You can't speculate. It's more speculation."

2. *None of the Prosecutor's Statements Constitute Misconduct*

a. *Relevant legal standards*

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305, quoting *People v. Morales* (2001) 25 Cal.4th 34, 44.)

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same

13

ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.]" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1219 (*Rangel*).)

" 'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions there was ' "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*Rangel, supra*, 62 Cal.4th at p. 1219.) " 'In conducting this inquiry, [the courts] "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) Indeed, "prosecutorial commentary should not be given undue weight in analyzing how a reasonable jury understood . . . instructions. Juries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the 'statements of advocates.' Thus, [a prosecutor's] argument should 'not be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made. [Citations.]' " (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) Finally, "[a] criminal prosecutor has much latitude when making a closing argument. Her argument may be strongly worded and vigorous so long as it fairly comments on the evidence admitted at trial or asks the jury to draw reasonable inferences and deductions from that evidence." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1330.)

14

b. *The prosecutor's comments that the defense had failed to produce evidence regarding the "mystery person" or "Louie" did not improperly shift the burden of proof to the defense*

Shrofe contends that the prosecutor improperly shifted the burden of proof to him and his codefendants to prove their innocence by pointing out to the jury, during rebuttal closing argument, that the defense had failed to produce any evidence regarding either the " 'mystery person who supposedly hired them,' " or "Louie," a neighbor who the defense suggested may have either hired the group or was himself planning to break into the Graf residence.

A prosecutor "may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' " (*People v. Young* (2005) 34 Cal.4th 1149, 1195–1196.)  However, a prosecutor may comment upon a defendant's failure to introduce material evidence or call logical witnesses (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275; *People v. Bradford* (1997) 15 Cal.4th 1229, 1338–1340 (*Bradford*); *People v. Wash* (1993) 6 Cal.4th 215, 263), and such comments do not impermissibly shift the burden of proof to the defendant (*People v. Rhoades* (2019) 8 Cal.5th 393, 448 (*Rhoades*); *Gonzales*, *supra*, 54 Cal.4th at p. 1275; see *People v. Alaniz* (2017) 16 Cal.App.5th 1, 7 ["a jury's consideration of the defense's failure to call logical witnesses is proper and does not impermissibly shift the burden of proof"]).  Indeed, " 'it is neither unusual nor improper to comment on the failure to call logical witnesses.' " (*Rhoades*, *supra*, at p. 448.)

For example, a prosecutor may permissibly comment on a defendant's failure to "call witnesses who might logically explain" the presence of an inculpatory vehicle at or near the crime scene.  (*People v. Cornwell* (2005) 37 Cal.4th 50, 90–91, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  It is also permissible for a prosecutor to

15

comment on a defendant's failure to produce family members as mitigating character witnesses, where the prosecutor's comments did not "suggest[ ] . . . a legal burden to present family members in mitigation" but merely drew attention to, "as is permitted, . . . defendant's failure to call logical witnesses." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1173, disapproved on another ground in *Doolin*, *supra*, at p. 421, fn. 22.)

Shrofe contends that the prosecutor "inverted" the burden of proof by suggesting to the jury that the defense had failed to support their alibi defense. As Shrofe points out, in fact, no alibi defense was presented; Clark merely testified that she believed that the group had been hired to do a job at the residence. No defendant or defense witness testified that someone had, in fact, hired Ortega to pack up the home and no defense witness purported to know who that person might be. It appears that the prosecutor may have misunderstood the precise nature of the defense's argument regarding having been "hired" to do a job at the residence, as reflected in his argument that the defense had presented no evidence regarding who had hired them. Rather than asserting that they had, in fact, been hired, such that they actually had permission to be in the home, the defense contention was that the defendants *believed* that they had been hired and, thus, that they were lawfully in the residence with the owner's permission, thereby raising reasonable doubt about whether they had the requisite intent to be convicted of burglary. According to Shrofe, because there had been no specific assertion by the defense that implied that certain evidence existed that would be logically available to them to produce, the prosecutor's comment was not a fair comment on the defense's failure to produce evidence.

However, as the People point out on appeal, the existence of a person who had purportedly hired Ortega was relevant and material to the question

16

whether the defendants actually harbored that belief, regardless of whether the defendants' beliefs were correct or whether they had somehow been tricked. Thus, to the extent the prosecutor was pointing out the failure to call a nondefendant logical witness who could have testified that someone had, in fact, hired the group to pack up the Grafs' belongings, such a comment was a fair statement on the failure to call a logical witness. Further, the failure to call anyone else to corroborate the claim that the defendants *believed* they had been hired undercut the veracity of that claim and was something that the prosecutor could fairly point out. (See *Rhoades*, *supra*, 8 Cal.5th at p. 448 [permissible to point out the failure to call logical witnesses].)[6]

Even if the prosecutor may have misapprehended the nuances of the defense contention that the defendants may not have actually been hired but may have *believed* that they had been hired to do a job at the Graf residence, his comments did not inappropriately shift the burden of proof to the defense. Specifically, the prosecutor did not suggest to the jury that the defendants had a duty to produce evidence; the prosecutor specifically noted in his argument that the defense had "absolutely no burden, no burden to produce evidence, no burden to call witnesses." In addition, during this line of argument, the trial court repeated the admonition that it had given to the jury at the conclusion of the prosecutor's case-in-chief, telling the jury that the defense had "absolutely no obligation to produce any evidence for you whatsoever." Given this context, it was not reasonably probable that the jury

---

6    If the only evidence that could have corroborated the defense that the group believed they had been hired was Ortega's testimony, or the testimony of other defendants, this would have been problematic. However, the defense left open the possibility that there may have been someone else who had "duped" the group into entering the home.

understood the prosecutor's comments as implying that the defense had a duty to produce evidence.

Similarly, although Shrofe complains about the prosecutor's comments regarding the defense's failure to call the neighbor, Louie, as a witness, those comments, too, went to the failure to call a logical witness and were proper. The defense vaguely insinuated throughout the trial that Louie, a neighbor of the Grafs, may have been responsible for the fact that Shrofe and his codefendants were caught inside the Graf residence. To the extent that the defense was suggesting that Louie might have been involved in a ruse to make the defendants believe that they had permission to enter the residence, Louie would have been a logical and material witness to call to testify to the role, if any, that he played in connection with Shrofe's and his codefendants' entry into the Graf residence. But the defense never called him. The prosecutor's argument regarding Louie was a comment on the fact that the defense had not subpoenaed Louie as a witness, even though they could have, despite the fact that he would have been a logical witness to corroborate the defense's suggestions that he may have been involved in convincing the defendants to enter the home. These comments were thus directed at the state of the evidence, and did not suggest to the jury that Shrofe or any of his codefendants had the burden to produce evidence or prove their innocence.

We conclude that in view of the entire record, there is no likelihood that the jury would have understood the prosecutor's comments as imposing any burden on Shrofe; therefore, the prosecutor's comments did not amount to misconduct. (See *Bradford*, *supra*, 15 Cal.4th at p. 1340 [rejecting defendant's claim of impermissible burden shifting, where "[the prosecutor] reiterated that the prosecution had the burden of proof by sufficient evidence

18

to establish defendant's guilt, and that defendant had no duty or burden to produce any evidence"]; *People v. Ratliff* (1986) 41 Cal.3d 675, 691 [prosecutor's comment that defendant had presented "[a]bsolutely zero" evidence was not improper burden shifting, as it did not "suggest[ ] that defendant had a burden of proof which he failed to carry," the court's jury instructions confirmed that the prosecution bore the entire burden of establishing guilt, and the prosecutor acknowledged that the defendant " 'doesn't have to prove a darn thing' "].)

      c.   *There is no reasonable likelihood that the jury understood the prosecutor's comments regarding the owl earring to refer to Shrofe's failure to testify, and the prosecutor's comments pertaining to the owl earring did not constitute unfair "sandbagging" of the defense*

Shrofe contends that the prosecutor violated *Griffin*, *supra*, 380 U.S. 609, by commenting on the defense's failure to " 'explain to [the jury]' " the owl earring found in the bed of the truck that they drove to the Graf residence. He further contends that the prosecutor's referring to the earring for the first time in rebuttal impermissibly "sandbagged" the defense by depriving them of the opportunity to respond to the prosecutor's argument.

Shrofe did not raise an objection to the prosecutor's comments under *Griffin*. As a result, he has forfeited the issue. (See *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657.) However, Shrofe also raises a claim of ineffective assistance of counsel, and we will therefore consider the contention on its merits. (See *People v. Williams* (2000) 78 Cal.App.4th 1118, 1126 [reviewing court may consider merits of appellant's argument to forestall an ineffective assistance of counsel claim].) Even on the merits, we find the argument lacking.

19

Under *Griffin*, the Fifth Amendment bars a prosecutor from " 'suggesting to the jury that it may treat [a] defendant's silence as substantive evidence of guilt.' " (*United States v. Robinson* (1988) 485 U.S. 25, 32, citation omitted; see *Griffin*, *supra*, 380 U.S. at p. 615.) "[I]t is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf." (*People v. Hughes* (2002) 27 Cal.4th 287, 371–372, citation omitted (*Hughes*).) However, the *Griffin* prohibition " ' "does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses." ' " (*Hughes*, *supra*, at p. 372.) The prohibition of *Griffin* is violated only where there is a " 'reasonable likelihood that any of the [prosecutor's] comments could have been understood, within its context, to refer to defendant's failure to testify.' " (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1523.)

Shrofe argues that the prosecutor's comments regarding the owl earring impermissibly suggested to the jury that Shrofe should have testified to explain the presence of the earring in the bed of his truck. Again, the prosecutor's rebuttal commentary about the owl earring was as follows:

> "[The defense claim of a hiring arrangement] is the story. That is the lie they are trying to sell you. And the one thing that none of them, none of the defendants can explain to you is that [appellant] has never been to that house. And no one exited that house between the time that they entered and the time they were contacted by police. And there is an owl earring in the trunk of that bed[;] it doesn't add up, ladies and gentlemen. The lie doesn't add up."

In considering the prosecutor's comments regarding the owl earring, we conclude that there is no reasonable likelihood that the jury understood the

prosecutor's comments to be referring to Shrofe's failure to testify. First, there was no express comment regarding Shrofe's failure to testify. Further, although Shrofe contends that the prosecutor's comment was an indirect reference to his failure to testify, it seems clear that the prosecutor's comment was directed at the state of the evidence and was made in response to the defense's suggestion that Shrofe and his codefendants had entered the Graf residence pursuant to an alleged belief that they had been hired to pack up the belongings in the home. The prosecutor was arguing that the presence of the owl earring in the bed of Shrofe's truck was factually incompatible with the defense story that these defendants believed they had been hired to complete a packing job, which included the implication that they had never been at the Graf residence before. The prosecutor noted the incongruity between the defense story and this piece of evidence, and argued that Shrofe's defense was simply not credible, stating, "The lie doesn't add up."

These comments went to the state of the evidence and were not a comment on Shrofe's failure to testify; there is no reasonable likelihood that the jury understood them as such. The prosecutor's comment about the owl earring therefore did not constitute a violation of *Griffin*. (See, e.g., *People v. Lancaster* (2007) 41 Cal.4th 50, 84 [prosecutor's comment that the defense failed to explain how defendant's fingerprints were found on a bottle was a "fair comment on the state of the evidence, rather than a comment on defendant's failure to personally provide an alternative explanation"]; *Hughes, supra*, 27 Cal.4th at pp. 374–375 [prosecutor's rhetorical question, " 'Why do you bring a knife if you don't intend to use it,' " was "read . . . as a fair comment on the evidence, not as a veiled attempt to highlight defendant's failure to testify"]; *People v. Medina* (1995) 11 Cal.4th 694, 755–756 [prosecutor's comments to jury that the defense " 'did not explain' " and

21

failed to give a " 'rational explanation' " for a defendant being seen in possession of a handgun during the times of various robberies was not *Griffin* error, because the comments "were directed to the general failure of the defense to provide an innocent explanation as to why defendant was armed," and "contained no references, express or implied, to defendant's own silence"].)

We also reject Shrofe's contention that the prosecutor's comments about the owl earring constituted improper rebuttal argument that "sandbagged" the defense. It is true that a prosecutor may not wait until rebuttal to present the bulk of the prosecution's argument in order to gain an unfair advantage. (*People v. Hill* (1967) 66 Cal.2d 536, 565; *People v. Robinson* (1995) 31 Cal.App.4th 494, 505 [prosecutor committed misconduct by giving perfunctory, three and one-half page initial argument "designed to preclude effective defense reply," which was then followed by a 35-page rebuttal argument].) Here, however, the prosecutor's comment did not amount to sandbagging. The prosecutor's initial closing argument comprised 28 pages, while his rebuttal comprised 12. Further, the comment about the owl earring was specifically responsive to the argument made by the defense to the effect that the defendants' story about being hired to pack the belongings in the house was sufficiently plausible to raise a reasonable doubt. The fact that the prosecutor did not mention the owl earring in his initial closing argument but did so in rebuttal did not deprive Shrofe of a fundamentally fair trial, nor did it constitute a deceptive or reprehensible method, and thus it did not amount to prosecutorial misconduct.

B.  *Our independent review of the transcript of the trial court's in camera review does not reveal any abuse of discretion in the court's conclusion that the warrant had been properly sealed and should remain sealed*

In connection with the sealed search warrant that was executed in case No. SCD278606-02, Shrofe filed a motion under *People v. Hobbs* (1994) 7 Cal.4th 948 on February 19, 2019, in which he requested that the trial court conduct an in camera review to determine whether the warrant had been, and remained, properly sealed.

The trial court conducted an in camera hearing on March 12, 2019.  At the conclusion of the hearing, the court found that the warrant had been properly sealed and that it should remain sealed.

Shrofe has asked this court to "independently review the transcript of the in camera hearing and any materials reviewed in that hearing" to determine whether the warrant was property sealed and properly remained sealed.  Having reviewed the transcript of the hearing,[7] we conclude that

---

[7]     A Clerk's Certificate was filed by the Clerk of the Superior Court, certifying that a deputy clerk "looked through the case file and there are no known materials that were reviewed by the tr[ia]l court during th[e in camera] hearing."  Our review of the transcript of the hearing does not lead this court to question the Clerk of the Superior Court's certification on this matter.

there was no abuse of discretion in the court's determination that the original sealing of the warrant was proper and that continued sealing was proper.

## IV.

## DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DATO, J.